1

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley Lynn Grombacher, Esq. (SBN 245960)
31365 Oak Crest Dr., Suite 240
Westlake Village, California, 91361
Telephone:    (805) 270-7100
Facsimile:    (805) 270-7589
Email: mbradley@bradleygrombacher.com
Email: kgrombacher@bradleygrombacher.com

**Attorneys for Plaintiffs Ricky Jolly, et al.**

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT FOR THE**

8 **NORTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| RICKY JOLLY, AMANDA WINBUSH, DARRYL WEEKLY and ANTONIO JOHNSON, individually and on behalf of others similarly situated | **CASE NO.:** |
| Plaintiffs, | **COMPLAINT FOR DAMAGES FOR:** |
| v. | 1. **BREACH OF EXPRESS WARRANTIES;** |
| GLOBAL BLOOD THERAPEUTICS, INC. and PFIZER, INC. | 2. **BREACH OF IMPLIED WARRANTIES;** |
| Defendants. | 3. **VIOLATION OF THE MAGNUSON-MOSS ACT;** |

10

11

12

13

14

15

16

1. **BREACH OF EXPRESS WARRANTIES;**

2. **BREACH OF IMPLIED WARRANTIES;**

3. **VIOLATION OF THE MAGNUSON-MOSS ACT;**

4. **COMMON LAW FRAUD;**

5. **UNJUST ENRICHMENT;**

6. **VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT;**

7. **VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT;**

8. **VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT;**

9. **VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT;**

10. **VIOLATION OF THE ILLINOIS VONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT;**

11. **VIOLATION OF THE ILLINOIS UNFAIR DECEPTIVE TRADE PRACTICES ACT.**

**DEMAND FOR JURY TRIAL**

17

18

19

20

21

22

23

24

25

26

27

28

1
**COMPLAINT FOR DAMAGES**

Plaintiffs Ricky Jolly, Amanda Winbush, Darryl Weekly and Antonio Johnson by and through the undersigned counsel, brings this civil action against Defendants Global Blood Therapeutics, Inc. and Pfizer, Inc. ("Defendants") individually and on behalf of all other similarly situated consumers (the "Class" as more fully defined herein), upon personal knowledge as to themselves and their own acts, and as to all other on information and belief, and alleges the following:

**INTRODUCTION**

1.      This is an action for damages related to Defendants' wrongful conduct in connection with the development, design, testing, manufacturing, labeling, packaging, promoting, advertising, marketing, distribution, and selling of Oxbryta (generic name: voxelotor) ("Oxbryta" or "the Product") a prescription medication used to treat sickle cell disease ("SCD").

2.      Pfizer is a multinational pharmaceutical behemoth which boasts on its website that it "innovate[s] every day to make the world a healthier place.[1]"

3.      Pfizer targets "underserved communities"[2] such as its "Sickle Cell Disease Warriors", offering amongst other products, Oxbryta for use by adults and children as young as four (4) years of age.

4.      On September 25, 2024, Defendants announced that it was voluntarily withdrawing all lots of Oxbryta, in all markets where it is approved (hereinafter the Recall).[3] The decision came after "data showed an imbalance in Vaso-occlusive crises ["VOCs"], a complication of the disease and "fatal events" that required further assessment."[4]

5.      Defendants knew or should have known for decades that Oxbryta, when administered and prescribed as intended, can cause or substantially contribute to VOCs, infections, stroke, and even death.

6.      For purposes of inducing consumers to purchase Oxbryta, Defendants: (a) affirmatively

---

[1] https://www.pfizer.com/about (last viewed December 23, 2023.)
[2] https://www.pfizer.com/about(last viewed December 23, 2023.)
[3] https://www.pfizer.com/news/press-release/press-release-detail/pfizer-voluntarily-withdraws-all-lots-sickle-cell-disease (last viewed December 23, 2023.)
[4] https://www.reuters.com/business/healthcare-pharmaceuticals/pfizer-withdraws-sickle-cell-disease-treatment-all-markets-2024-09-25/ (last viewed December 23, 2023.)

**COMPLAINT FOR DAMAGES**

misrepresented the most important and material facts directly to consumers regarding the safety of Oxbryta; and/or (b) misbranded Oxbryta; and/or (c) fraudulently concealed from and/or failed to disclose to consumers material facts regarding the safety of Oxbryta.

7.    Nevertheless, Defendants failed to warn, instruct, advise, educate, or otherwise inform Oxbryta users and prescribers about the risk of increased VOCs, infections, stroke, and/or death.

8.    Federal law requires Defendants to ensure that their drug labels remain accurate, and when new scientific information renders their labels inaccurate, federal law requires Defendants to act. Failure to do so renders Oxbryta misbranded.

9.    Plaintiffs are consumers who purchased Oxbryta during the Class Period and who would not have bought them or would have paid less for them had Defendants disclosed the truth. Plaintiffs filed this litigation on behalf of themselves and all consumers in the United States who purchased Oxbryta to hold Defendants to account for their fraud, and to recover as damages the money they spent as a result of that fraud. Plaintiffs also seek to enjoin Defendants from future violations of California's consumer protection statutes, relief oriented to and for the benefit of the general public.

## **PARTIES**

10.    Plaintiff, Ricky Jolly ("Plaintiff Jolly") is a citizen of the State of Indiana who within the last four years paid out of pocket for Oxbryta. Oxbryta was purchased for personal, family, or household purposes. In making their purchase, Plaintiff Jolly relied upon the product packaging and the Pfizer brand name to make his purchasing decisions. Plaintiff Jolly was unaware of the Defect at the time of acquisition. Had Plaintiff Jolly been aware of the Defect in Oxbryta, Plaintiff Jolly would not have paid for the drug. Plaintiff Jolly seeks full reimbursement of all out-of-pocket costs associated with acquiring Oxbryta and costs associated with the Recall. While some of Plaintiff's costs may have been paid through insurance, Plaintiff had out-of-pocket costs related to the acquisition of Oxbryta.

11.    On December 13, 2024, Plaintiff Jolly caused a Notice of Breach to be sent via U.S. Mail to Pfizer advising that they had breached the express and implied warranties they had made to their when he purchased Oxbryta medicine because the company disclose, instruct, advise, educate, or otherwise inform Oxbryta users and prescribers about the risk of increased VOCs, infections, stoke, and/or death

12.    Plaintiff, Amanda Winbush ("Plaintiff Winbush") is a citizen of the State of Virginia who within the last four years paid out of pocket for Oxbryta. Oxbryta was purchased for personal, family, or household purposes. In making their purchase, Plaintiff Winbush relied upon the product packaging and the Pfizer brand name to make her purchasing decision. Plaintiff Winbush was unaware of the Defect at the time of acquisition. Had Plaintiff Winbush been aware of the Defect in Oxbryta, Plaintiff Winbush would not have paid for the drug. Plaintiff Winbush seeks full reimbursement of all out-of-pocket costs associated with acquiring Oxbryta and costs associated with Recall. While some of Plaintiff's costs may have been paid through insurance, Plaintiff's paid out-of-pocket costs related to the acquisition of Oxbryta.

13.    On December 18, 2024, Plaintiff Winbush caused a Notice of Breach to be sent via U.S. Mail to Pfizer advising that they had breached the express and implied warranties they had made to their when he purchased Oxbryta medicine because the company disclose, instruct, advise, educate, or otherwise inform Oxbryta users and prescribers about the risk of increased VOCs, infections, stroke, and/or death.

14.    Plaintiff, Darryl Weekly ("Plaintiff Weekly") is a citizen of the State of Illinois who within the last four years paid out of pocket for Oxbryta. Oxbryta was purchased for personal, family, or household purposes. In making their purchase, Plaintiff Weekly relied upon the product packaging and the Pfizer brand name to make his purchasing decision. Plaintiff Weekly was unaware of the Defect at the time of acquisition. Had Plaintiff Weekly been aware of the Defect in Oxbryta, Plaintiff Weekly would not have paid for the drug. Plaintiff Weekly seeks full reimbursement of all out-of-pocket costs associated with acquiring Oxbryta and costs associated with the Recall. While some of Plaintiff's costs may have been paid through insurance, Plaintiff's paid out-of-pocket costs related to the acquisition of Oxbryta.

15.    On December 23, 2024, Plaintiff Weekly caused a Notice of Breach to be sent via U.S. Mail to Defendants advising that they had breached the express and implied warranties they had made to their when he purchased Oxbryta medicine because the company disclose, instruct, advise, educate, or

otherwise inform Oxbryta users and prescribers about the risk of increased VOCs, infections, stroke, and/or death.

16.    Plaintiff Antonio Johnson ("Plaintiff Johnson") is a citizen of the State of Georgia who within the last four years paid out of pocket for Oxbryta. Oxbryta was purchased for personal, family, or household purposes. In making his purchase, Plaintiff Johnson relied upon the product packaging and the Pfizer brand name. Plaintiff Johnson was unaware of the Defect at the time of acquisition. Had Plaintiff Johnson been aware of the Defect in Oxbryta, Plaintiff Johnson would not have paid for the drug. Plaintiff Johnson seeks full reimbursement of all out-of-pocket costs associated with acquiring Oxbryta and costs associated with the Recall. While some of Plaintiffs' costs may have been paid through insurance, Plaintiff's paid out-of-pocket costs related to the acquisition of Oxbryta.

17.    On December 18, 2024, Plaintiff Johnson caused a Notice of Breach to be sent via U.S. Mail to Pfizer advising that they had breached the express and implied warranties they had made to their when he purchased Oxbryta medicine because the company disclose, instruct, advise, educate, or otherwise inform Oxbryta users and prescribers about the risk of increased VOCs, infections, stroke, and/or death.

18.    Defendant Global Blood Therapeutics, Inc. is a Delaware corporation, with its principal executive offices located at 181 Oyster Point Boulevard, South San Francisco, California 94080.

19.    Defendant, Pfizer, Inc. is a New York corporation that is licensed to do business in all states of the United States of America including the State of California.

20.    Defendant Global Blood Therapeutics, Inc. "discovered and developed" Oxbryta, which was granted accelerated approval by the FDA in November 2019.[5]

---

[5] https://www.pfizer.com/news/press-release/press-release-detail/pfizer-completes-acquisition-global-blood-therapeutics (last viewed December 23, 2023.)

21.     On October 5, 2022, Defendant Pfizer announced the acquisition of Defendant Global Blood Therapeutics, in a transaction "valued at $68.50 per Global Blood Therapeutics share in cash, for a total enterprise value of approximately $5.4 billion."[6]

22.     Upon information and belief, Defendant Global Blood Therapeutics is a wholly owned subsidiary of Defendant Pfizer.

23.     All Defendants do business in California by, among other things, distributing, marketing, selling and/or profiting from Oxbryta in California as well as throughout the United States.

24.     At all times material herein, Defendants were, and still are, pharmaceutical companies involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Oxbryta, in California, and throughout the United States.

## **JURISDICTION AND VENUE**

25.     Jurisdiction over this matter is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2), because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one Plaintiffs were a citizen of a different state than at least one defendant.

26.     This Court has jurisdiction over Defendant Global Blood Therapeutics, Inc. because their principal place of business is in San Mateo County, California.

27.     This Court also has jurisdiction over Defendant Pfizer because they are a business entity that does sufficient business and has minimum contacts in California or otherwise intentionally avail themselves of the California market, through the sale, marketing and use of its Product in California, to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

28.     All Defendants regularly conduct business in California.

---

[6] https://www.pfizer.com/news/press-release/press-release-detail/pfizer-acquire-global-blood-therapeutics-54-billion-enhance (last viewed December 23, 2023.)

**COMPLAINT FOR DAMAGES**

29.     This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

30.     Venue of this case is proper in California because some or all of the cause of action arose in California.

**GENERAL ALLEGATIONS**

**<u>Sickle Cell Disease</u>**

31.     SCD is a group of inherited red blood cell disorders. Red blood cells contain hemoglobin, a protein that carries oxygen. Healthy red blood cells are round, and they move through small blood vessels to carry oxygen to all parts of the body.

32.     In someone who has SCD, the hemoglobin is abnormal, which causes the red blood cells to become hard and sticky and look like a C-shaped farm tool called a sickle. The sickle cells die early, which causes a constant shortage of red blood cells. Also, when they travel through small blood vessels, sickle cells get stuck and clog the blood flow. This can cause pain and other serious complications (health problems) such as infection, acute chest syndrome, and stroke.

33.     There are several types of SCD. The specific type of SCD a person has depends on the genes they inherited from their parents. People with SCD inherit genes that contain instructions, or code, for abnormal hemoglobin, including:

**HbSS:** People who have this form of SCD inherit two genes, one from each parent, that code for hemoglobin "S." Hemoglobin S is an abnormal form of hemoglobin that causes the red cells to become rigid, and sickle shaped. This is commonly called sickle cell anemia and is usually the most severe form of the disease.

**HbSC**: People who have this form of SCD inherit a hemoglobin S gene from one parent and a gene for a different type of abnormal hemoglobin called "C" from the other parent. This is usually a milder form of SCD.

**HbS beta thalassemia**: People who have this form of SCD inherit a hemoglobin S gene from one parent and a gene for beta thalassemia, another type of hemoglobin abnormality, from the other parent. There are two types of beta thalassemia: "zero" (HbS beta0) and "plus" (HbS beta+). Those with HbS

beta0-thalassemia usually have a severe form of SCD. People with HbS beta+-thalassemia tend to have a milder form of SCD.

34.     SCD is diagnosed with a simple blood test. In children born in the United States, it most often is found at birth during routine newborn screening tests at the hospital. In addition, SCD can be diagnosed while the baby is in the womb. Diagnostic tests before the baby is born, such as chorionic villus sampling and amniocentesis, can check for chromosomal or genetic abnormalities in the baby. Chorionic villus sampling tests a tiny piece of the placenta called chorionic villus. Amniocentesis tests a small sample of amniotic fluid surrounding the baby.[7]

**Oxbryta**

35.     The active substance in Oxbryta, was supposed to work by improving the ability of the hemoglobin to hold on to oxygen, and preventing it from forming chains. In theory, this would help the red blood cells to maintain normal shape and flexibility, reducing their excess breakdown and improving their lifespan.

36.     The FDA approved Oxbryta under the accelerated approval pathway in 2019 for the treatment of sickle cell disease in adults and pediatric patients 12 years of age and older. In 2021, FDA granted accelerated approval of Oxbryta for the treatment of sickle cell disease in patients 4 to 11 years of age. Accelerated approval is based on a surrogate or intermediate clinical endpoint that is reasonably likely to predict clinical benefit, allowing for earlier approval of drugs that treat serious conditions and fill an unmet medical need. In general, FDA requires post-marketing studies to verify and describe the clinical benefit of medications approved under this program. *Id.*

37.     Defendants marketed Oxbryta through various forms of media and promised its purchasers would "experience less sickling."[8]

38.     Defendant Global Blood Therapeutics called Oxbryta a "firsts-of-its-kind tablet that treats

---

[7] https://www.cdc.gov/sickle-cell/about/index.html#:~:text=Sickle%20cell%20disease%20(SCD)%20is,some%20more%20severe%20than%20others.

[8] https://www.mmm-online.com/home/channel/first-look-oxbryta-spot-aims-to-empower-patients-with-sickle-cell/

**COMPLAINT FOR DAMAGES**

sickle cell. . ." and would lead to "less sickling" by "address[ing] sickling at its source." [9]



---

[9] https://sicklecellconsortium.org/wp-content/uploads/2020/06/Oxbryta-Core-Patient-Leave-Behind-Electronic-Version-2.pdf







*Id.*

39.     On September 25, 2024, Defendants announced they were voluntarily withdrawing the medication from the market, ceasing distribution, and discontinuing all active clinical trials and expanded access programs for Oxbryta "because recent data indicate the benefit of Oxbryta does not outweigh the risks for the sickle cell patient population."[10]

40.     Defendants noted that their decision was "based on the totality of clinical data that now indicates the overall benefit of OXBRYTA no longer outweighs the risk in the approved sickle cell patient population. The data suggest an imbalance in vaso-occlusive crises and fatal events which require further assessment."[11]

41.     According to the European Medicines Agency, Study GBT440-032 assessed the effects of voxelotor on the transcranial doppler ultrasound measurements of cerebral arterial blood flow in

---

[10] https://www.fda.gov/drugs/drug-safety-and-availability/fda-alerting-patients-and-health-care-professionals-about-voluntary-withdrawal-oxbryta-market-due (last viewed December 23, 2024.)

[11] https://www.pfizer.com/news/press-release/press-release-detail/pfizer-voluntarily-withdraws-all-lots-sickle-cell-disease (last viewed December 23, 2024.)

**COMPLAINT FOR DAMAGES**

children from 2 to 15 years of age with SCD and are at high risk of stroke. The study recruited 236 patients from Egypt, Ghana, Kenya, Nigeria, Oman, Saudi Arabia, the United States and the United Kingdom. There were 8 deaths in people taking voxelotor and 2 deaths in people taking placebo.[12]

42.     Study GBT440-042 assessed the effects of voxelotor on leg ulcers in 88 patients from 12 years of age recruited from Brazil, Kenya and Nigeria. Eight deaths occurred in the open-label part of this study. *Id.*

43.     "The initiation of the review follows an imbalance of deaths between voxelotor and placebo observed in clinical trials," the European Medicines Agency said in an agenda of the meeting posted on its website.[13]

## **TOLLING OF ALL APPLICABLE STATUTES OF LIMITATION**

### *Discovery Rule Tolling*

44.     Plaintiffs and the other Class members had no way of knowing about Defendants' deception concerning their Product. As consumers, they reasonably believed that Oxbryta was reasonably safe for consumer use as marketed and labeled by Defendants.

45.     Within the time period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that Defendants' Product was unreasonably dangerous.

46.     Plaintiffs and the other Class members did not discover and did not know facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge about the dangers of Oxbryta.

47.     For these reasons, all applicable statutes of limitation have been tolled through the discovery rule for the asserted claims.

///

---

[12] https://www.ema.europa.eu/en/documents/referral/oxbryta-article-20-procedure-review-started_en.pdf (last viewed December 23, 2024.)

[13]     https://www.reuters.com/business/healthcare-pharmaceuticals/pfizer-withdraws-sickle-cell-disease-treatment-all-markets-2024-09-25/ (last viewed December 23, 2024.)

*Fraudulent Concealment Tolling*

48.     All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

49.     Despite their knowledge that that Oxbryta, when administered and prescribed as intended, can cause or substantially contribute to VOCs and even death, Defendants intentionally withheld and never disclosed to consumers that information in any form.

50.     Rather than disclose the truth about the Product, Defendants falsely represented Oxbryta was safe when use as directed.

51.     Absent discovery, Plaintiff was unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Defendants' companies responsible for disseminating false and misleading statements to consumers regarding the safety of the Product. Defendants necessarily are in possession of this information.

52.     Plaintiffs' claims arise out of Defendants' fraudulent concealment of the dangers of Oxbryta and Defendants' representations to consumers regarding the safety of their Product.

53.     To the extent that Plaintiffs' claims arise from Defendants' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs bases their claims. Plaintiffs alleges that at all relevant times, including specifically prior to and at the time he purchased their Product: Defendants knew, or were reckless in not knowing, of the lack of safety of Oxbryta; Defendants were under a duty to truthfully disclose the dangers and risks associated with normal and expected use of the Product based upon a) their exclusive and/or superior knowledge of the lack of safety of the Product; b) their partial representations about the safety of the Product, and c) their active concealment of the lack of safety of the Product. Defendants never disclosed the risks and dangers of Oxbryta to Plaintiffs or consumers at any time or place or in any manner.

54.     Plaintiffs makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

///

**COMPLAINT FOR DAMAGES**

a. **Who:** Defendants actively concealed the true safety of the Product from Plaintiffs and the other Class Members, while simultaneously falsely touting the safety of their Product. Plaintiffs were unaware of, and therefore unable to identify without discovery, the names and identities of those specific individuals at Defendants' companies responsible for such decision;

b. **What:** Defendants knew, or were reckless or negligent in not knowing, that;

c. **When:** Defendants concealed material information regarding the Product and made representations about Oxbryta's safety from the time the product was brought to market in 2019 and continuing until the time of the Recall. Defendants never took any action to adequately inform consumers about the true nature of the risks accompanying normal and expected use of Oxbryta;

d. **Where:** Defendants concealed material information regarding the safety of the Product and in online and in physical advertisements. Plaintiffs were aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the true safety of the Product to anyone outside of Defendants' companies. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, or disclaimers on Defendants' websites;

e. **How:** Defendants concealed the lack of safety and unreasonable risks associated with Oxbryta from Plaintiffs and the other Class Members and made misrepresentations about safety of the Product. Defendants promised in their marketing materials and on their Oxbryta labels that the Product has qualities that it does not have. Defendants actively concealed the truth about the lack of safety of the Product from Plaintiffs and the other Class Members, even though Defendants knew that Oxbryta, when

administered and prescribed as intended, can cause or substantially contribute to VOCs, infections, stroke, and even death and knew that information would be important to a reasonable consumer;

f. **Why**: Defendants actively concealed material information and made material misrepresentations about the safety of the Product for the purpose of inducing Plaintiffs and the other Class Members to purchase Oxbryta, and/or pay more for them than they otherwise would. Had Defendants disclosed the truth, for example on their Product, in their advertisements or other materials or communications, Plaintiffs and the other Class Members (all reasonable consumers) would have been aware of it and would not have bought the Product or would have paid less for it.

### *Estoppel*

55.     Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of Oxbryta.

56.     Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of Oxbryta.

57.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

### CLASS ACTION ALLEGATIONS

58.     Plaintiffs brings this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

59.     Plaintiffs seeks to represent the following Classes:

### Nationwide Class

All natural persons who, from November 1, 2019 to the present, purchased the Product in the United States or its territories, other than for resale and paid at least some portion of Oxbryta out-of-pocket;

**Indiana Sub-Class**

Plaintiff Jolly seeks certification on behalf of a subclass defined as follows ("Alabama Subclass"):
All natural persons in Indiana who, from November 1, 2019, to the present, in whole or part, purchased Oxbryta, not for resale, and paid at least some portion of the Product out-of-pocket;

**Virginia Sub-Class**

Plaintiff Winbush seeks certification on behalf of a subclass defined as follows ("Virginia Subclass"):
All natural persons in Indiana who, from November 1, 2019, to the present, in whole or part, purchased Oxbryta, not for resale, and paid at least some portion of the Product out-of-pocket;

**Georgia Sub-Class**
Plaintiff Johnson seeks certification on behalf of a subclass defined as follows ("Georgia Subclass"):
All natural persons in Indiana who, from November 1, 2019 to the present, in whole or part, purchased Oxbryta, not for resale, and paid at least some portion of the Product out-of-pocket;

**Illinois Sub-Class**
Plaintiff Weekly seeks certification on behalf of a subclass defined as follows ("Georgia Subclass"):
All natural persons in Illinois who, from November 1, 2019 to the present, in whole or part, purchased Oxbryta, not for resale, and paid at least some portion of the Product out-of-pocket;

60.     Excluded from the Classes are: any claims for personal injury or wrongful death; Defendants, and any of Defendants' members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the Judges assigned to this case and their immediate family members; and Court staff assigned to this case.

61.     This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

62.     Plaintiffs reserves the right before the Court to determine whether certification of other classes or subclasses are appropriate.

**COMPLAINT FOR DAMAGES**

63.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

64.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

65.     **Numerosity- Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs were informed and believe that there are millions of members of the Classes based on the size of the market for decongestant products and Defendants' share of that market. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

66.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**

This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

      a.  whether Defendants engaged in the conduct alleged herein;

      b.  whether Defendants' alleged conduct violates applicable law;

      c.  whether and when Defendants knew that Oxbryta was dangerous and posed unreasonable risks to consumers;

      d.  whether Defendants sold Oxbryta as though it was and is safe for consumer use;

      e.  what measures Defendants took to conceal the truth about their Product;

      f.  Defendants' duty to disclose the truth about their Product;

      g.  whether Plaintiffs and the other Class members overpaid for Defendants' Product;

      h.  whether Plaintiffs and the other Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief;

i.  whether Plaintiffs and the Class are entitled to public injunctive relief prohibiting future violations of law by Defendants and the nature of such relief; and

j.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

67.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class Members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and all Class members suffered monetary damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

68.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

69.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making declaratory and injunctive relief appropriate, with respect to each Class as a whole.

70.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in managing this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Classes to seek redress for Defendants' wrongful conduct individually. Even if Class members could afford individual litigation, such litigation creates a potential for inconsistent or contradictory judgments. It increases the delay and expense to all parties and the court system. By contrast, a class action is suited and intended to manage such difficulties and provide the

benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

71.     **Issue Certification – Federal Rule of Civil Procedure 23(c)(4).** As an alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiffs seeks issue certification under Rule 23(c)(4) of liability issues common to all Class members.

## COUNT I:

## BREACH OF EXPRESS WARRANTIES

### By Plaintiffs on Behalf of the Class and All Subclasses

72.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

73.     At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Oxbryta, which is defective and unreasonably dangerous to consumers and the general public, including Plaintiff, thereby placing Oxbryta products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

74.     Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of the Product, including a duty to:

        a.     ensure that the Product did not cause the user unreasonably dangerous side effects;

        b.     warn of dangerous and potentially fatal side effects; and

        c.     disclose adverse material facts, such as the true risks associated with the use of and exposure to Oxbryta, when making representations to consumers and the general public, including Plaintiff.

75.     Oxbryta's label confirms that it was "indicated for the treatment of sickle cell disease in adults and pediatric patients 4 years of age and older."[14]

---

[14]     https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/213137s006lbl.pdf     (last     viewed December 23, 2024.)

**COMPLAINT FOR DAMAGES**

76.     As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with Oxbryta is not limited to representations made on the labeling.

77.     Defendants marketed Oxbryta through various forms of media and promised its purchasers would "experience less sickling."[15]

78.     At all relevant times, Defendants expressly represented and warranted  to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Oxbryta was safe to human health and the environment, effective, fit, and proper for its intended use. Defendants advertised, labeled, marketed, and promoted the Product, representing the quality to consumers and the public in such a way as to induce its purchase or use, thereby making an express warranty that Oxbryta would conform to the representations.

79.     These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Oxbryta. Defendants knew and/or should have known that the risks expressly included in Oxbryta warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that the Product was safe and effective, that it was safe and effective for use by individuals such as the Plaintiff, and/or that they were safe and effective as consumer medication.

80.     The representations about Oxbryta, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

81.     Defendants placed Oxbryta products into the stream of commerce for sale and recommended its use to consumers and the public without adequately warning of the true risks of

---

[15]     https://www.mmm-online.com/home/channel/first-look-oxbryta-spot-aims-to-empower-patients-with-sickle-cell/(last viewed December 23, 2024.)

1  developing the injuries associated with the use of Oxbryta.

2      82.    Defendants breached these warranties because, among other things, the Product was and

3  is defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature

4  of the risks associated with its use, and was and is not merchantable or safe for its intended, ordinary,

5  and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

6          a.  Defendants represented through their labeling, advertising, and marketing materials

7              that Oxbryta is safe, and intentionally withheld and concealed information about the

8              risks of serious injury associated with use of Oxbryta and by expressly limiting the

9              risks associated with use within its warnings and labels; and

10         b.  Defendants represented that Oxbryta is safe for use and intentionally concealed

11             information that demonstrated that Oxbryta could lead to higher risks of VOCs and

12             death.

13     83.    Plaintiffs detrimentally relied on the express warranties and representations of Defendants

14 concerning the safety and/or risk profile of Oxbryta in deciding to purchase the Product. Plaintiffs

15 reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of Oxbryta.

16 Plaintiffs would not have purchased or used Oxbryta had Defendants properly disclosed the risks

17 associated with the Product, either through advertising, labeling, or any other form of disclosure.

18     84.    Defendants had sole access to material facts concerning the nature of the risks associated

19 with their Oxbryta Product, as expressly stated within its warnings and labels, and knew that consumers

20 and users such as Plaintiff, as well as the public at large, could not have reasonably discovered that the

21 risks expressly included in Oxbryta warnings and labels were inadequate and inaccurate.

22     85.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendants' statements

23 and representations concerning Oxbryta.

24     86.    Plaintiffs used and/or was exposed to Oxbryta as researched, developed, designed, tested,

25 manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released

26 into the stream of commerce by Defendants.

27     87.    Had the warnings, labels, advertisements, or promotional material for Oxbryta accurately

28

and adequately set forth the true risks associated with the use of the Product, rather than expressly excluding such information and warranting that Oxbryta was safe for its intended use, Plaintiffs could have avoided the injuries complained of herein.

88.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

89.    As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other damages.

90.    WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in Plaintiffs' favor and against Defendants for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

<u>**COUNT I:**</u>

<u>**BREACH OF IMPLIED WARRANTIES**</u>

**By Plaintiffs on Behalf of the Class and all Subclasses**

91.    Plaintiffs incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

92.    The implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. See, e.g., Ala. Code § 7-2-314, et seq.; Alaska Stat. § 45.02.314, et seq.; Ariz. Rev. Stat. Ann. § 47-2314, et seq.; Ark. Code Ann. § 4-2-314, et seq.; Cal. Com. Code § 2314, et seq.; Colo. Rev. Stat. § 4-2-314, et seq.; Conn. Gen. Stat. Ann. § 42a-2-314, et seq.; Del. Code Ann. tit. 6, § 2-314, et seq.; D.C. Code Ann. § 28:2-314, et seq.; Fla. Stat. Ann. § 672.314, et seq.; O.C.G.A. § 11-2-314, et seq.; Haw. Rev. Stat. § 490:2-314, et seq.; Idaho Code § 28-2- 314, et seq.; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, et seq.; Ind. Code Ann. § 26-1-2-314, et seq.; Iowa Code Ann. § 554.2314, et seq.; Kan. Stat. Ann. § 84-2-314, et seq.; Ky. Rev. Stat. Ann. § 355.2-314, et seq.; La. Civ. Code Ann. art. 2520, et seq.; Me. Rev. Stat. Ann. tit. 11, § 2- 314, et seq.; Md. Code Ann., Com. Law § 2-314, et seq.; Mass. Gen. Laws Ann. Ch. 106, § 2- 314, et seq.; Mich. Comp. Laws Ann. § 440.2314, et seq.; Minn. Stat. Ann. § 336.2-

314, et seq.; Miss. Code Ann. § 75-2-314, et seq.; Mo. Rev. Stat. § 400.2-314, et seq.; Mont. Code Ann. § 30- 2-314, et seq.; Neb. Rev. Stat. § 2-314, et seq.; Nev. Rev. Stat. § 104.2314, et seq.; N.H. Rev. Stat. Ann. § 382-A:2-314, et seq.; N.J. Stat. Ann. § 12A:2-314, et seq.; N.M. Stat. Ann. § 55-2- 314, et seq.; N.Y. U.C.C. Law § 2-314, et seq.; N.C. Gen. Stat. Ann. § 25-2-314, et seq.; N.D. Cent. Code § 41-02-31, et seq.; Ohio Rev. Code Ann. § 1302.27, et seq.; Okla. Stat. tit. 12A, § 2- 314, et seq.; Or. Rev. Stat. § 72.3140, et seq.; 13 Pa. Stat. Ann. § 2314, et seq.; R.I. Gen. Laws § 6A-2-314, et seq.; S.C. Code Ann. § 36-2-314, et seq.; S.D. Codified Laws § 57A-2-314, et seq.; Tenn. Code Ann. § 47-2-314, et seq.; Tex. Bus. & Com. Code § 2.314, et seq.; Utah Code Ann. § 70A-2-314, et seq.; Va. Code Ann. § 8.2-314, et seq.; Vt. Stat. Ann. tit. 9A, § 2-314, et seq.; Wash. Rev. Code § 62A.2-314, et seq.; W. Va. Code § 46-2-314, et seq.; Wis. Stat. Ann. § 402.314, et seq.; and Wyo. Stat. Ann. § 34.1-2-314, et seq.

93.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Oxbryta, which was and is defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Oxbryta into the stream of commerce.

94.    Pfizer has at all times, been a merchant with respect to the products which were sold to Plaintiffs and the Class, under U.C.C. §§ 2-104 and 2-314, as codified in each state; and was in the business of selling such products.

95.    Before the time Plaintiffs used the Product, Defendants impliedly warranted to their consumers, including Plaintiff, and to the public at large that Oxbryta was of merchantable quality and safe and fit for the use for which it was intended; specifically, as consumer medication.

96.    But Defendants failed to disclose that Oxbryta has dangerous propensities when used as intended and that use of Oxbryta carries an increased risk of developing severe injuries.

97.    Plaintiff was an intended beneficiary of the implied warranties made by Defendants to purchasers of their Oxbryta Product.

98.    Oxbryta was expected to reach and did in fact reach consumers and users, including Plaintiff, and the general public, without substantial change in the condition in which they were manufactured and sold by Defendants.

99.   At all relevant times, Defendants were aware that consumers and users of their Product, including Plaintiff, would use Oxbryta as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Oxbryta.

100.   Defendants intended that Oxbryta be used in the manner in which Plaintiff, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though Oxbryta was not adequately tested or researched.

101.   In reliance upon Defendants' implied warranty, Plaintiffs used Oxbryta as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

102.   Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Oxbryta.

103.   Defendants breached their implied warranty to Plaintiffs in that the Product was and is not of merchantable quality, safe, or fit for its intended use, or adequately tested. Oxbryta has dangerous propensities when used as intended and can cause serious injuries.

104.   The harm caused by Defendants' Oxbryta Product far outweighed its benefit, rendering the Product more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

105.   Defendants have refused to provide appropriate warranty relief notwithstanding the risks of using Oxbryta. Plaintiffs and the Class reasonably expected, at the time of purchase that the drugs were usable for their ordinary and intended use.

106.   Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendants' breach of its implied warranty of usability because, had they known of the risks of serious injury associated with Oxbryta they would not have purchased them.

107.   To the extent privity may be required, Plaintiffs and the members of the Class can establish privity with Defendants or, alternatively, can establish that they fall into an exception to a privity requirement.

108.   Plaintiffs and the members of the Class relied on Defendants' warranties and dealt directly with Defendants through the exchange of warranty and recall information.

109.    Plaintiffs and the members of the Class were foreseeable and intended third-party beneficiaries of Defendants' sale of Oxbryta, and/or of contracts between Defendants and the distributors or sellers of Oxbryta.

110.    Oxbryta is a drug that affect human health and life; and therefore, they implicate the broad public policy of protecting human health and life.

111.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiffs has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

112.    Defendants, their agents and employees knew, or should have known, that Oxbryta suffered from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

113.    Enforcement of a privity requirement would unfairly prejudice Plaintiffs and the members of the Class, who relied on Defendants' warranties and dealt directly with Defendants through the exchange of warranty and recall information.

114.    Plaintiffs are not required to give notice to Defendants, a remote manufacturer and Defendants have had notice of the type and source of claims in this multi-district litigation, through counsel, sent Defendants a letter complying with any required pre-suit notification requirements.

115.    WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in Plaintiffs' favor and against Defendants for compensatory and punitive damages in an amount to be determined at trial, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:

### VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT

### 15 U.S.C. § 2301, et seq.

### By Plaintiffs On behalf of the Nationwide Class and all Subclasses

116.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

COMPLAINT FOR DAMAGES

117.    Oxbryta constitute "consumer products" as defined in 15 U.S.C. § 2301(1).

118.    Oxbryta are tangible personal property owned by Plaintiffs and the members of the Class.

119.    Oxbryta was distributed in commerce.

120.    Oxbryta is normally used for personal and/or household purposes, in that they are used by individual persons to treat SCD. This is a personal purpose because it is a purpose related to the person or the body.

121.    Plaintiffs and the members of the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

122.    Plaintiffs and the members of the Class are buyers or lessors of Oxbryta, and/or are persons to whom Oxbryta was transferred during the duration of implied and written warranties applicable to Oxbryta, and/or are persons entitled by the terms of those warranties, and by applicable State law, to enforce against Defendants the obligations of the warranties.

123.    Defendants are "suppliers" of Oxbryta as defined in 15 U.S.C. § 2301(4).

124.    Defendants are or was engaged in the business of making Oxbryta, which are consumer products, and of making other consumer products, directly or indirectly available to consumers, including through its subsidiaries and third-party distributors.

125.    Defendants are "warrantors" as defined in 15 U.S.C. § 2301(5).

126.    Defendants are suppliers or other persons: (a) who gave or offered to give a written warranty applicable to Oxbryta; and/or (b) who is or may be obligated under an implied warranty applicable to Oxbryta.

127.    As discussed above, Defendants made numerous implied warranties to Plaintiffs and members of the Class with respect to Oxbryta.

128.    The warranties made by Defendants pertained to consumer products costing the consumer more than five dollars, see 15 U.S.C. § 2302(e).

129.    Plaintiffs and the members of the Class invoke federal jurisdiction for the claims stated under this Count pursuant to the Class Action Fairness Act.

130.     Oxbryta was defective when they came off Defendants' assembly lines and at all subsequent times (including at the times of sale and/or delivery to Plaintiffs and the members of the Class) because the defective design.

131.     As a result, Oxbrtya was worth nothing at the time of their sales.

132.     Plaintiffs and the members of the Class would not have purchased or accepted Oxbryta had they known the drugs were dangerously defective.

133.     Defendants violated the Magnuson-Moss Federal Warranty Act by failing to comply with the implied warranties they made to Plaintiffs and the members of the Class.

134.     Plaintiffs and the other members of the Class need not have given notice of the defects to Defendants and an opportunity for Defendants to comply with their warranty obligations prior to the filing of this suit because Plaintiffs may give such notice to Defendants on their own behalf and on behalf of the Class after class certification pursuant to 15 U.S.C. § 2310(e).

135.     Plaintiffs and the members of the Class sustained injuries and damages as a proximate result of Defendants violation of its implied warranties and are entitled to legal and equitable relief against Defendants, including compensatory damages consisting of: the difference between the values of Oxbryta as warranted (their prices) paid and their actual values at the time of purchase or other miscellaneous incidental and consequential damages. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other members of the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by them in connection with the commencement and prosecution of this action.

## COUNT IV:

## COMMON LAW FRAUD

### By Plaintiffs on Behalf of the Class and All Subclasses

136.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

137.     At all relevant times, Defendants knew that Oxbryta posed serious VOC health risks to

**COMPLAINT FOR DAMAGES**

1   users.

2       138.    As set forth more fully above, Defendants marketed and sold Oxbryta as a treatment for

3   sickle cell disease. While selling and profiting from Oxbryta, Defendants knew that they were defective

4   in that they posed serious VOC health risks to users.

5       139.    Defendants concealed and failed to disclose in any of its marketing materials, advertising,

6   packaging, and/or any other communication that Oxbryta posed a serious VOC health risk. These material

7   omissions were misleading and deceptive standing alone and were particularly deceptive in light of the

8   fact that Oxbryta were sold as a treatment for sickle cell disease.

9       140.    Defendants concealed Plaintiffs and Class members and failed to disclose to them material

10  information regarding the serious VOC health risks posed to users of Oxbryta by, among other things,

11  failing to include material information in its packaging, labels, advertisements, promotional materials,

12  websites, and other communications and disclosures.

13      141.    Defendants were under a duty to disclose to, among others, Plaintiffs, Class members, and

14  their physicians, the serious VOC health risks posed to users of  Oxbryta because: (a) Defendants were

15  in a superior position to know the risks associated with the use of Oxbryta; (b) Defendants were in a

16  superior position to determine whether or not to disclose or conceal information regarding  Oxbryta in

17  its packaging, labels, advertising, websites, and other communications and disclosures; (c) Defendants

18  had a duty to fully disclose all facts related to the serious health risks to users posed by Oxbryta; (d)

19  Defendants knew that Plaintiffs, Class members and their physicians could not reasonably have been

20  expected to learn or discover the serious health risks posed by use of Oxbryta prior to purchasing, leasing,

21  recommending, paying for Oxbryta in general, and particularly given the representations, concealed

22  material information, and omissions by Defendants in its packaging, labels, advertising, websites, and

23  other communications and disclosures; and (e) Defendants has a duty to disclose information related to

24  the health and safety of its products, including Oxbryta.

25      142.    By concealing and failing to disclose the Defect, Defendants intentionally, knowingly,

26  and recklessly allowed its packaging, labels, advertisements, promotional materials, websites, and other

27  communications  and  disclosures  to  mislead  Plaintiffs,  Class  members,  and  their  physicians,  into

28

**COMPLAINT FOR DAMAGES**

believing that Oxbryta were safe for use.

143.    Defendants knew that its concealment and omissions regarding the Defect in its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures were false, deceptive, inadequate, and misleading.

144.    The information undisclosed and concealed by Defendants were material. A reasonable consumer, including Plaintiffs and Class members, would find information that impacted on users' health and well-being, such as the serious adverse health risks associated with the use of Oxbryta, to be important when deciding whether to purchase, Oxbryta.

145.    As a result of such deceptive packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures, Plaintiffs and the Class members justifiably and reasonably believed Oxbryta were safe for use.

146.    Defendants intentionally, knowingly, and recklessly concealed and omitted information about the Defect and its related serious health effects in its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures regarding Oxbryta to induce Plaintiffs and Class members to purchase Oxbryta.

147.    Plaintiffs and Class members justifiably and reasonably relied on the omissions by Defendants and purchased, in whole or part, Oxbryta. Reasonable consumers would have been expected to rely on these omissions, in part, because they are omissions that seriously impact users' health and well-being.

148.    Defendants' fraudulent conduct actually and proximately caused harm to Plaintiffs and Class members because absent Defendants' concealment and omissions, Plaintiffs and Class members would have behaved differently and would not have purchased Oxbryta.

149.    As a direct and proximate result of Defendants' material omissions, misrepresentations, and concealment of material information regarding the Defect and its adverse health effects on users of Oxbryta, Plaintiffs and the Class members have suffered actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: the difference between the values of Oxbryta as represented (their prices) paid and their actual values at

the time of purchase; and other miscellaneous incidental and consequential damages.

## COUNT V:

## UNJUST ENRICHMENT

### By Plaintiffs on Behalf of the Class and All Subclasses

150. Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

151. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, or otherwise released Oxbryta into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, including Plaintiffs.

152. Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions, and advertisements that omitted disclosure that the Product presented an unreasonable risk of substantial bodily injury resulting from its use.

153. Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs and the Class conferred onto Defendants at the detriment of Plaintiffs and the Class. These benefits were the expected result of Defendants acting in their pecuniary interests at the expense of Plaintiffs and the Class.

154. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

155. Defendants wrongfully obfuscated the harm caused by Oxbryta. Thus, Plaintiffs and the Class, who mistakenly enriched Defendants by relying on Defendants' misrepresentations of the Product's safety, could not and did not know the effect that using Oxbryta could have on the health of Plaintiffs and the Class and the unreasonable risks posed by ordinary and expected use of Oxbryta.

156. Plaintiffs and the Class were entitled to restitution of the benefits Defendants unjustly retained and/or any amount necessary to return Plaintiffs and the Class to the position they occupied prior to dealing with Defendants. Plaintiffs and the Class would expect compensation from Defendants' unjust

**COMPLAINT FOR DAMAGES**

enrichment stemming from their wrongful actions.

157.    WHEREFORE, Plaintiffs and the Class respectfully request this Court to enter judgment in Plaintiffs' favor and against Defendants for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT

### Ga. Code. Ann. § 10-1-370, et seq.

### By Plaintiff Johnson and the Georgia Subclass

158.    Plaintiff Antonio Johnson ("Plaintiff Johnson") realleges and incorporates by reference all preceding allegations as though fully set forth herein.

159.    Plaintiff Johnson bring this cause of action individually and on behalf of the members of the Georgia Subclass.

160.    The Georgia Uniform Deceptive Trade Practices Act was created to protect Georgia consumers from deceptive and unfair business practices.

161.    Plaintiff Johnson and Georgia Subclass members purchased Oxbryta for personal purposes.

162.    Defendants marketed and advertised Oxbryta to consumers, physicians, and other healthcare entities in Georgia. In addition, Defendants, among other things, sold Oxbryta in Georgia, shipped Oxbryta to Georgia, and otherwise engaged in trade or commerce, or conducted business, related to Oxbryta in Georgia.

163.    Defendants marketed and sold Oxbryta. While selling and profiting from Oxbryta, Defendants knew that they were defective in that they posed significant risks of substantial VOC physical injury to consumers. Defendants intentionally concealed this material information from consumers, users, payors and health professionals because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat their sickle cell disease.

164.    Defendants concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication Oxbryta posed serious health issues. These material

omissions were misleading and deceptive standing alone and were particularly deceptive in light of the fact that Oxbryta was sold as a treatment for sickle cell disease.

165. Defendants' conduct constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, Oxbryta, in trade or commerce in Georgia, making it unlawful under Ga. Code. Ann. § 10-1-370, et seq.

166. Defendants' conduct constituted, among other things, the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that Oxbryta had characteristics, ingredients, uses, benefits or quantities, which it did not have; (b) misrepresenting that Oxbryta is of a particular standard, quality, or grade, or that goods are of a particular style or model, when it is not; (c) advertising Oxbryta with intent not to sell it as advertised; and (d) engaging in other conduct that creates a likelihood of confusion or of misunderstanding.

167. Defendants' conduct was fraudulent and deceptive because the omissions had the capacity or tendency to deceive and, in fact, did deceive reasonable consumers, including Plaintiff Johnson. Reasonable consumers, including Plaintiff Johnson, would have found it material to their purchasing decisions that Oxbryta would subject users to potential serious health consequences. Knowledge of those facts would have been a substantial factor in Plaintiff Johnson's, as well as other Georgia Subclass members', decision to purchase, lease, or reimburse payment for Oxbryta.

168. Defendants owed Plaintiff Johnson and Georgia Subclass members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; and because Oxbryta pose an unreasonable risk of substantial bodily injury.

169. Plaintiff Johnson and members of the Georgia Subclass justifiably relied on the material misrepresentations and/or omissions by Defendants, and reasonable consumers would have been expected to rely upon these omissions, in part, because they are omissions that impact seriously on a consumer's health and well-being.

170.     Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiff Johnson (as set forth above) and members of the Georgia Subclass, who are also likely to be damaged in the future on an ongoing basis in the future. Absent Defendants' unfair and fraudulent conduct, Plaintiff Johnson and Georgia Subclass members would have behaved differently and would not have purchased, Oxbryta. Defendants' omissions induced Plaintiff Johnson and Georgia Subclass members to purchase Oxbryta, which they would not otherwise have done.

171.     Accordingly, pursuant to Ga. Code. Ann. § 10-1-370, et seq., Plaintiff Johnson and Georgia Subclass members are entitled to injunctive relief, reasonable attorneys' fees, as well as equitable relief necessary or proper to protect them from Defendants' unlawful conduct.

### COUNT VII:

### VIOLATIONS OF GEORGIA FAIR BUSINESS PRACTICES ACT

### Ga. Code. Ann. § 10-1-390, *et seq.*

### By Plaintiff Johnson On Behalf of the Georgia Subclass

172.     Plaintiff Johnson realleges and incorporates by reference all preceding allegations as though fully set forth herein.

173.     The Georgia Fair Business Practices Act was created to protect Georgia consumers from deceptive and unfair business practices.

174.     Plaintiff Johnson and Georgia Subclass members purchased Oxbryta for personal purposes.

175.     Defendants marketed and advertised Oxbryta to consumers, physicians, and other healthcare entities in Georgia. In addition, Defendants, among other things, sold Oxbryta in Georgia, shipped Oxbryta to Georgia, and otherwise engaged in trade or commerce, or conducted business, related to Oxbryta in Georgia.

176.     As set forth more fully above, Defendants marketed and sold Oxbryta as a treatment for sickle cell disease. While selling and profiting from Oxbryta, Defendants knew that they were defective in that they posed serious health risks to users. Defendants intentionally concealed this material information from consumers, users, payors and health professionals because to do otherwise would have

**COMPLAINT FOR DAMAGES**

resulted in purchasers and/or users seeking safer alternatives to treat SCD.

177.    Defendants conduct concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that Oxbryta were defective and posed a serious health risk to users. These material omissions were misleading and deceptive standing alone and were particularly deceptive in light of the fact that Oxbryta was sold as a sickle cell treatment.

178.    Defendants conduct constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, Oxbryta, in trade or commerce in Georgia, making it unlawful under Ga. Code. Ann. § 10-1-390, et seq.

179.    Defendants' conduct constituted, among other things, the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that Oxbyrta has characteristics, ingredients, uses, or benefits, which they do not have; (b) misrepresenting that Oxbyrta has a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) advertising goods with intent not to sell them as advertised.

180.    Defendants' conduct was fraudulent and deceptive because the omissions had the capacity or tendency to deceive and, in fact, did deceive, reasonable consumers, including Plaintiff Johnson. Reasonable consumers, including Plaintiff Johnson, would have found it material to their purchasing decisions that Oxbryta would subject users to potential serious bodily injury and other health consequences. Knowledge of those facts would have been a substantial factor in Plaintiff Johnson's, as well as Georgia Subclass members', decision to purchase Oxbyrta.

181.    Defendants owed Plaintiff Johnson and Georgia Subclass members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; and because Oxbyrta poses an unreasonable risk of substantial bodily injury.

182.    Plaintiff Johnson and members of the Georgia Subclass justifiably relied on the material misrepresentations and/or omissions by Defendants, and reasonable consumers would have been

expected to rely upon these omissions, in part, because they are omissions that impact seriously on a consumer's health and well-being.

183.    Defendants conduct actually and proximately caused an ascertainable loss of money or property to Plaintiff Johnson (as set forth above) and members of the Georgia Subclass. Absent Defendants' unfair, deceptive and/or fraudulent conduct, Plaintiff Johnson and Georgia Subclass members would have behaved differently and would not have purchased Oxbryta. Defendants' omissions induced Plaintiff Johnson and Georgia Subclass members to purchase Oxbryta, which they would not otherwise have done.

184.    Accordingly, pursuant Ga. Code. Ann. § 10-1-390, et seq., Plaintiff Johnson and Georgia Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: the difference between the values of Oxbryta as represented (their prices paid) and their actual values at the time of purchase; and other miscellaneous incidental and consequential damages. In addition, given the nature of Defendants' conduct, Plaintiff Johnson and Georgia Subclass members are entitled to injunctive relief and all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

185.    To the extent that any pre-suit notice was purportedly required, Defendants has had notice of its violations for over a year. Plaintiffs have complied or substantially complied with all applicable notice requirements or are otherwise excused from compliance for this proceeding. In addition, at a minimum, on December 18, 2024, Plaintiffs involved in this multi-district litigation, through counsel, sent Defendants a letter complying with any required pre- suit notification requirements. These letters put Defendants on notice of the demands of the Plaintiff Johnson and Georgia Subclass members, and Defendants' responses made clear that Defendants refused to acknowledge and cure the violations in a manner that would compensate Plaintiff Johnson and Georgia Subclass members for all the economic losses they have suffered as a result of Defendants' misconduct. Defendants has failed to remedy its unlawful conduct. In addition, Plaintiffs are not required to provide pre-suit notice because Defendants

does not maintain a place of business or does not keep assets within the state of Georgia. Finally, notice was provided, and any additional notice would have been futile.

## COUNT VIII:

### VIOLATIONS OF INDIANA DECEPTIVE CONSUMER SALES ACT

### Ind. Code § 24-5-0.5-1, *et seq.*

### By Plaintiff Jolly On Behalf of the Indiana Subclass,

186.    Plaintiff Ricky Jolly ("Plaintiff Jolly") reallege and incorporates by reference the allegations of paragraphs 1 through 157 as though fully set forth herein.

187.    Plaintiff Jolly brings this cause of action individually and on behalf of the members of the Indiana Subclass.

188.    The Indiana Deceptive Consumer Sales Act ("IDCSA") was created to protect Indiana consumers from deceptive and unfair business practices.

189.    Plaintiff Jolly and Indiana Subclass members purchased Oxbryta for personal purposes.

190.    Defendants marketed and advertised Oxbryta to consumers, physicians, and other healthcare entities in Indiana. In addition, Defendants, among other things, sold Oxbryta in Indiana, shipped Oxbryta to Indiana, and otherwise engaged in trade or commerce, or conducted business, related to Oxbryta in Indiana.

191.    As set forth more fully above, Defendants marketed and sold Oxbryta as a treatment for sickle cell. While selling and profiting from Oxbryta, Defendants knew that they were defective in that they posed serious VOC health risks to. Defendants intentionally concealed this material information from consumers, users, payors, prescribers, and other healthcare providers because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat SCD.

192.    Defendants concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that Oxbryta were defective and would expose users to toxic gas as a result of the degradation and off-gassing of the PE-PUR foam. This material omission was misleading and deceptive standing alone and was particularly deceptive in light of the fact that Oxbryta were sold as a treatment for sickle cell disease.

193.     Defendants' conduct constitutes the knowing use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, Oxbryta, in trade or commerce in Indiana, making it unlawful under Ind. Code § 24-5-0.5-1, et seq.

194.     Defendants' conduct constituted, among other things, the following prohibited fraudulent, deceptive, and unfair business practices: (a) representing that such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; (b) representing that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; (c) representing that a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not; and (d) representing that such consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false. Ind. Code § 24-5-0.5-3.

195.     Defendants' conduct was fraudulent and deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive ordinary consumers, including Plaintiff Jolly. Ordinary consumers, including Plaintiff Jolly, would have found it material to their purchasing decisions that the PE-PUR foam in  Oxbryta posed a risk of degradation and off-gassing that would subject users to potential serious health consequences. Knowledge of those facts would have been a substantial factor in Plaintiff Jolly, as well as other Indiana Subclass members' decision to purchase Oxbryta.

196.     Defendants owed Plaintiff Jolly  and Indiana Subclass members, among others, a duty to disclose these facts because they were known and/or accessible exclusively to Defendants who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; and because Oxbryta pose an unreasonable risk of substantial bodily

injury.

197.    Plaintiff Jolly and Indiana Subclass members justifiably relied on the material misrepresentations and/or omissions by Defendants, and reasonable consumers would have been expected to rely upon these omissions, in part, because they are omissions that impact seriously on a consumer's health and well-being.

198.    Defendants' conduct actually and proximately caused actual damages to Plaintiff Jolly and members of the Indiana Subclass. Absent Defendants' unfair, deceptive and/or fraudulent conduct, Plaintiff Jolly and Indiana Subclass members would have behaved differently and would not have purchased Oxbryta. Defendants' omissions induced Plaintiff Jolly and Indiana Subclass members to purchase Oxbryta, which they would not otherwise have done. Plaintiff Jolly and Indiana Subclass members acted as reasonable consumers would have acted under the circumstances, and Defendants' unlawful conduct would cause reasonable persons to enter into the transactions that resulted in the damages.

199.    Accordingly, pursuant to Ind. Code § 24-5-0.5-1, et seq., Plaintiff Jolly and Indiana Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: the difference between the values of Oxbryta as represented (their prices) paid and their actual values at the time of purchase; and other miscellaneous incidental and consequential damages. In addition, given the nature of Defendants' conduct, Plaintiff Jolly and Indiana Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Defendants' unlawful conduct.

200.    Defendants' conduct is "incurable" as defined by the IDCSA because it was done as part of a scheme with the intent to defraud, mislead, and engage in unfair business practices.

201.    Because Defendants' conduct is "incurable" as defined by the IDCSA, no pre-suit notice was required. To the extent that any pre-suit notice was purportedly required, Plaintiff Jolly have complied or substantially complied with all applicable notice requirements or are otherwise excused from

compliance for this proceeding. Defendants have had notice of its violations for over a year. In addition, at a minimum, on December 13, 2024, Plaintiffs involved in litigation, through counsel, sent Defendants a letter complying with any required pre-suit notification requirements. Thos letters put Defendants on notice of the demands of the Plaintiff Jolly and Indiana Subclass members, and Defendants' responses made clear that Defendants refused to acknowledge and cure the violations in a manner that would compensate Plaintiff Jolly and Indiana Subclass members for all the economic losses they have suffered as a result of Defendants' conduct. Defendants have failed to remedy its unlawful misconduct. In addition, any obligation to provide pre-suit should be excused because Defendants does not maintain a place of business or does not keep assets within the state of Indiana. Finally, notice was provided, and any additional notice would have been futile.

## COUNT IX:

## VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT

### Va. Code Ann. § 59.1-196, *et seq.*

### By Plaintiff Winbush On Behalf of the Virginia Subclass

202.    Plaintiff Amanda Winbush ("Plaintiff Winbush") realleges and incorporates by reference all preceding allegations set forth in paragraphs 1 through 157 as though fully set forth herein.

203.    The Virginia Consumer Protection Act ("VCPA") was created to protect Virginia consumers from deceptive and unfair business practices.

204.    Plaintiff Winbush, Virginia Subclass members, and Defendants are persons under the VCPA.

205.    Plaintiff Winbush, and Virginia Subclass members purchased Oxbryta in consumer transactions, i.e., for personal purposes.

206.    Defendants marketed and advertised Oxbryta to consumers, physicians, and other healthcare entities in Virginia. In addition, Defendants, among other things, sold Oxbryta in Virginia, shipped Obryta to Virginia, and otherwise engaged in trade or commerce, or conducted business, related to Oxbryta in Virginia.

207.    As set forth more fully above, Defendants marketed and sold Oxbryta as a treatment for

**COMPLAINT FOR DAMAGES**

sickle cell disease. While selling and profiting from Oxbryta, Defendants knew that they were defective in that they posed VOC serious health risks. Defendants intentionally concealed this material information from consumers, users, payors, prescribers, and other healthcare providers because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat SCD.

208.    Defendants concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that Oxbryta were defective and would expose users to toxic gas as a result of the degradation and off-gassing of the PE-PUR foam. This material omission was misleading and deceptive standing alone and was particularly deceptive because Oxbryta were sold as a treatment for sickle cell disease.

209.    Defendants' conduct described herein constitutes a violation of several of the provisions enumerated in Va. Code Ann. § 59.1-200(A)(1)-(60) including but not limited to: misrepresentations as to a product's characteristics; misrepresentations as to a product's standard or style; advertising goods with intent not to sell as advertised; and any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

210.    Defendants' conduct was fraudulent and deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive ordinary consumers, including Plaintiff Winbush. Ordinary consumers, including Plaintiff Winbush, would have found it material to their purchasing decisions that the PE-PUR foam in Oxbryta posed a risk of degradation and off-gassing that would subject users to potential serious health consequences. Knowledge of those facts would have been a substantial factor in Plaintiff Winbush', as well as other Virginia Subclass members', decision to purchase Oxbryta.

211.    Defendants owed Plaintiff Winbush and the Virginia Subclass members, among others, a duty to disclose these facts because they were known and/or accessible exclusively to Defendants who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; and because  Oxbryta pose an unreasonable risk of substantial bodily injury.

212.    Plaintiff Winbush, and members of the Virginia Subclass, justifiably relied on the material misrepresentations and/or omissions by Defendants, and reasonable consumers would have been expected to rely upon these omissions, in part, because they are omissions that impact seriously on a consumer's health and well-being.

213.    Defendants' conduct actually and proximately caused actual damages in the form of an ascertainable loss of money or property to Plaintiff Winbush and members of the Virginia Subclass. Absent Defendants' unfair, deceptive and/or fraudulent conduct, Plaintiff Winbush and the Virginia Subclass members would have behaved differently and would not have purchased Oxbryta. Defendants' omissions induced Plaintiff Winbush and Virginia Subclass members to purchase Oxbryta, which they would not otherwise have done. Plaintiff Winbush and Virginia Subclass members acted as reasonable consumers would have acted under the circumstances, and Defendants' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing, leasing, or reimbursing payment for Oxbryta) that resulted in the damages.

214.    Accordingly, pursuant to Va. Code § 59.1-204(A), Plaintiff Winbush and Virginia Subclass members are entitled to recover either (1) their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence, and those damages are: the difference between the values of Oxbryta as represented (their prices) paid and their actual values at the time of purchase ($0.00); or (2) $500 each, whichever is greater. In addition, given the nature of Defendants' conduct, Plaintiff Winbush and Virginia Subclass members are entitled to recover treble damages (or $1,000 each, whichever is greater) for the willful and knowing violation of the VCPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Defendants' unlawful conduct, and all such other relief as the Court deems proper.

**COUNT X:**

**VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES**

**ACT 815 Ill. Comp. Stat. Ann. § 505/1, et seq.**

**By Plaintiff Weekly On Behalf of the Illinois Subclass**

**COMPLAINT FOR DAMAGES**

215.    Plaintiff Weekly ("Illinois Plaintiffs") realleges and incorporates by reference all preceding allegations set out in paragraphs 1 through 157 as though fully set forth herein.

216.    Plaintiff Weekly bring this cause of action individually and on behalf of the members of the Illinois Subclass.

217.    The Illinois Consumer Fraud and Deceptive Business Practices Act was created to protect Illinois consumers from deceptive and unfair business practices.

218.    Plaintiff Weekly and Illinois Subclass members are persons who purchased Oxbryta for personal purposes and household use.

219.    Defendants marketed and advertised Oxbryta to consumers, physicians, and other healthcare entities in Illinois. In addition, Defendants, among other things, sold Oxbryta in Illinois, shipped Oxbryta to Illinois, and otherwise engaged in trade or commerce, or conducted business, related to Oxbryta in Illinois.

220.    As set forth more fully above, Defendants marketed and sold Oxbryta drugs that would help users treat SCD.

221.    While selling and profiting from Oxbryta, Defendants knew that they were defective in that they posed serious VOC health risks. Defendants intentionally concealed this material information from consumers, users, payors, prescribers, and other healthcare professionals because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat their SCD.

222.    Defendants concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that Oxbryta posed a serios VOC health risk. This material omission was misleading and deceptive.

223.    Defendants' conduct constitutes use or employment of deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression, or omission of material facts in connection with the sale and advertisement of merchandise, Oxbryta, in trade or commerce in Illinois, with the intention that Plaintiffs and Illinois Subclass members would rely on such concealment, suppression, or omission of material facts in deciding to purchase, lease, or reimburse payment for Oxbryta, making it unlawful under 815 Ill. Comp. Stat. Ann. § 505/1, et seq.

**COMPLAINT FOR DAMAGES**

224.    Defendants' prohibited deceptive business practices occurred primarily and substantially within Illinois.

225.    Defendants' conduct was fraudulent and deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive ordinary consumers, including Illinois Plaintiffs. Ordinary consumers, including Illinois Plaintiffs, would have found it material to their purchasing decisions Oxbryta posed a risk of potential serious health consequences. Knowledge of those facts would have been a substantial factor in Illinois Plaintiffs', as well as Illinois Subclass members', decision to purchase Oxbryta.

226.    Defendants owed Plaintiff Weekly and Illinois Subclass members, among others, a duty to disclose these facts because they were known and/or accessible exclusively Defendants who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; and because Oxbryta poses an unreasonable risk of substantial bodily injury.

227.    Plaintiff Weekly and Illinois Subclass members justifiably relied on the concealment, suppression, or omission of material facts made by Defendants, and reasonable consumers would have been expected to rely upon these misrepresentations and/or omissions, in part, because they are misrepresentations and/or omissions that impact seriously on a consumer's health and well-being.

228.    Defendants' conduct actually and proximately caused actual damages to Plaintiff Weekly (as set forth above) and members of the Illinois Subclass. Absent Defendants' unfair, deceptive and/or fraudulent conduct, Plaintiff Weekly and Illinois Subclass members would have behaved differently and would not have purchased, leased, or reimbursed payment for Oxbryta. Defendants' omissions induced Plaintiff Weekly and Illinois Subclass members to purchase, lease, or reimburse payment for Oxbryta, which they would not otherwise have done, in part, because they are omissions that impact seriously on consumer's health and well-being. Plaintiff Weekly and Illinois Subclass members acted as reasonable consumers would have acted under the circumstances, and Defendants' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing Oxbryta) that resulted in the damages.

**COMPLAINT FOR DAMAGES**

229.     Accordingly, pursuant to 815 Ill. Comp. Stat. Ann. § 505/1, et seq., Plaintiff Weekly and Illinois Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: the difference between the values of Oxbryta as represented (their prices) paid and their actual values at the time of purchase or lease ($0.00); and other miscellaneous incidental and consequential damages. In addition, given the nature of Defendants' conduct, Plaintiff Weekly and Illinois Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Defendants' unlawful conduct.

## COUNT XI:

### VIOLATIONS OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

### 815 Ill. Comp. Stat. Ann. § 5105/1, et seq.

### On Behalf of the Illinois Subclass

230.     Plaintiff Weekly ("Illinois Plaintiffs") realleges and incorporates by reference all preceding allegations set forth in paragraphs 1 through 157 as though fully set forth herein.

231.     Plaintiff Weekly brings this cause of action individually and on behalf of the members of the Illinois Subclass.

232.     The Illinois Uniform Deceptive Trade Practices Act was created to protect Illinois consumers from deceptive and unfair advertising practices.

233.     Plaintiff Weekly and Illinois Subclass members purchased Oxbryta for personal purposes and household use.

234.     Defendants marketed and advertised Oxbryta to consumers, physicians, and other healthcare entities in Illinois. In addition, Defendants, among other things, sold Oxbryta in Illinois, shipped Oxbryta to Illinois, and otherwise engaged in trade or commerce, or conducted business, related to Oxbryta in Illinois.

235.     As set forth more fully above, Defendants marketed and sold Oxbryta as machines that would help treat SCD. While selling and profiting from Oxbryta, Defendants knew that they were

**COMPLAINT FOR DAMAGES**

defective in that they posed serious VOC health risks. Defendants intentionally concealed this material information from consumers and other healthcare providers because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat their SCD.

236.    Defendants concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that Oxbryta posed a significant VOC health risk. This material omission was misleading and deceptive.

237.    Defendants' conduct described herein constitutes, among other things, the following prohibited deceptive trade practices: (a) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (b) representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, when they are of another; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 Ill. Comp. Stat. Ann. § 510/2. 1008. Defendants' prohibited deceptive trade practices occurred primarily and substantially within Illinois.

238.    Defendants' conduct was fraudulent and deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive, ordinary consumers, including Illinois Plaintiffs. Ordinary consumers, including Illinois Plaintiffs, would have found it material to their purchasing decisions that Oxbryta subjects users to potential serious health consequences. Knowledge of those facts would have been a substantial factor in Illinois Plaintiffs', as well as other Illinois Subclass members', decision to purchase Oxbryta.

239.    Defendants owed Plaintiff Weekly and Illinois Subclass members, among others, a duty to disclose these facts because they were known and/or accessible exclusively to who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the omissions in question; and because Oxbryta poses an unreasonable risk of substantial bodily injury.

240.    Plaintiff Weekly and Illinois Subclass members justifiably relied on the misrepresentations and/or omissions by Defendants, and reasonable consumers would have been

expected to rely upon these misrepresentations and/or omissions, in part, because they are misrepresentations and/or omissions that impact seriously on a consumer's health and wellbeing.

241.    Defendants' conduct actually and proximately caused actual damages to Plaintiff Weekly (as set forth above) and members of the Illinois Subclass. Absent Defendants' deceptive and/or fraudulent conduct, Plaintiff Weekly and Illinois Subclass members would have behaved differently and would not have purchased Oxbryta. Defendants' omissions induced Plaintiff Weekly and Illinois Subclass members to purchase Oxbryta, which they would not otherwise have done. Plaintiff Weekly and Illinois Subclass members acted as reasonable consumers would have acted under the circumstances, and Defendants' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing Oxbryta) that resulted in the damage.

242.    Accordingly, pursuant to 815 Ill. Comp. Stat. Ann. § 5105/1, et seq., Plaintiff Weekly and the Illinois Subclass members are entitled to equitable relief necessary or proper to protect them from Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs prays for a jury trial and for judgment against Defendants, and each of them, as follows **FOR ALL CAUSES OF ACTION:**

1.    For past, present and future general damages in an amount to be determined at trial;

2.    For past, present and future special damages, including but not limited to past, present and future lost earnings, economic damages and others, in an amount to be determined at trial;

3.    Any appropriate punitive or exemplary damages;

4.    Any appropriate statutory damages;

5.    For costs of suit;

6.    For interest as allowed by law;

7.    For attorney's fees and costs as applicable;

8.    For treble damages as applicable;

9.    For such other and further relief as the court may deem proper.

///

**COMPLAINT FOR DAMAGES**

Respectfully submitted,

Dated: December 23, 2024          **BRADLEY/GROMBACHER LLP**
                                  **AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**


                                  By: /s/ _Kiley Grombacher_____
                                          Marcus J. Bradley, Esq.
                                          Kiley L. Grombacher, Esq.
                                          S. Mary Lie, Esq.
                                          Attorneys for Plaintiff


## DEMAND FOR JURY TRIAL


Plaintiffs RICKY JOLLY, AMANDA WINBUSH, DARRYL WEEKLY and ANTONIO JOHNSON demands a jury trial in this matter.


Respectfully submitted,

Dated: December 23, 2024          **BRADLEY/GROMBACHER LLP**
                                  **AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**


                                  By: /s/ _Kiley Grombacher_____
                                          Marcus J. Bradley, Esq.
                                          Kiley L. Grombacher, Esq.
                                          S. Mary Lie, Esq.
                                          Attorneys for Plaintiff

**COMPLAINT FOR DAMAGES**